**No. 23-10215**

____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

REGINALD BERTRAM JOHNSON,
*Petitioner-Appellant*,

v.

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,
*Respondents-Appellees*.

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
(L.T. Case No. 1:19-cv-23494-JLK)**

**PETITIONER-APPELLANT'S BRIEF**

_____

Robert G. Keefe
**BOIES SCHILLER FLEXNER LLP**
100 S.E. 2nd Street – Suite 2800
Miami, FL 33131
Tel: (305) 539-8400
*Counsel for Petitioner-Appellant,
Reginald Bertram Johnson*

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Eleventh Circuit Rule 26.1, counsel for Petitioner-Appellant Johnson hereby certifies that the following persons and entities have or may have an interest in the outcome of this case:

1. Boies Schiller Flexner LLP

2. C.A., (minor victim)

3. Dixon, Rick, Secretary of the Florida Department of Corrections

4. Johnson, Reginald

5. Keefe, Robert

6. King, James, District Court Judge

7. Lipman, Sandra

8. Louis, Lauren, Magistrate Judge

9. Moody, Ashley, Florida Attorney General

10. Rodriguez, Magaly

Pursuant to Fed. R. App. P. 26.1 and Eleventh Circuit Rule 26.1-3(b), Petitioner-Appellant Johnson certifies that he is not a subsidiary or affiliate of a publicly owned corporation, and that he is not aware of any publicly owned corporation, not a party to the litigation, that has a financial interest in the outcome of this case.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Petitioner-Appellant Johnson respectfully requests oral argument. Petitioner-Appellant Johnson submits that oral argument is appropriate in this habeas corpus matter because the procedural history and issues are complex, the facts are extensive, and oral argument will assist this Court in resolving the issues on appeal.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ................................................................2

STATEMENT REGARDING ORAL ARGUMENT ................................3

TABLE OF CONTENTS................................................................4

TABLE OF CITATIONS ................................................................6

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION ....8

STATEMENT OF THE ISSUES................................................................8

STATEMENT OF THE CASE................................................................8

    I.      Proceedings and Disposition Below ....................................8

    II.     Statement of Relevant Facts ............................................11

    A.     The Crime, Police Investigation & Arrest......................11

    B.     The Trial ................................................................15

    C.     Direct Appeal................................................................26

    D.     Federal Habeas Proceedings ............................................27

    III.    Standards of Review ........................................................28

    A.     Antiterrorism and Effective Death Penalty Act..............29

    B.     The *Brecht* Standard ........................................................30

SUMMARY OF THE ARGUMENT ..................................................32

ARGUMENT AND CITATIONS OF AUTHORITY ............................34

I.    The Florida Supreme Court Unreasonably Applied *Crawford*, *Melendez-Diaz*, and *Bullcoming* In Determining That The Admission of Dr. Silla's Report Did Not Violate Johnson's Confrontation Rights ........................................34

II.    The Violation of Johnson's Confrontation Rights Was Not Harmless 40

CONCLUSION ........................................................................................46
CERTIFICATE OF COMPLIANCE ........................................................48
CERTIFICATE OF SERVICE .................................................................48

# TABLE OF CITATIONS

## CASES

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) ...................................................... 28, 31

*\*Bullcoming v. New Mexico*, 564 U.S. 647 (2011) ......................... 32, 34, 36, 37, 39

*\*Crawford v. Washington*, 541 U.S. 36 (2004) .................................... 32, 34, 36, 39

*Davis v. Ayala*, 576 U.S. 257 (2015) ................................................................ 29, 31

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986) .........................................................31

*Fry v. Pliler*, 551 U.S. 112 (2007) ...........................................................................31

*Garlick v. Lee*, 1 F.4th 122 (2d Cir. 2021) ............................................. 35, 36, 44, 45

*Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089 (11th Cir. 2022) ..............................35

*Grossman v. McDonough*, 466 F.3d 1325 (11th Cir. 2006) ....................................46

*Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336 (11th Cir. 2011) ............ 41, 42, 43

*Johnson v. Florida*, 574 U.S. 896 (2014) .......................................................... 10, 27

*Johnson v. State*, 117 So. 3d 1238 (Fla. Dist. Ct. App. 2013) ................ 9, 27, 34, 35

*Johnson v. State*, 147 So. 3d 524 (Fla. 2014) ......................................................9, 27

*Johnson v. State*, 203 So. 3d 916 (Fla. Dist. Ct. App. 2016) ...................................10

*Johnson v. State*, 252 So. 3d 221 (Fla. Dist. Ct. App. 2018) ...................................10

*Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301 (11th Cir. 2012) ................ 29, 31

*Mason v. Allen*, 605 F.3d 1114 (11th Cir. 2010) .....................................................46

*McGahee v. Ala. Dep't of Corr.*, 560 F.3d 1252 (11th Cir. 2009) ..........................29

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) ... 32, 34, 36, 37, 39, 40, 41

*Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025 (11th Cir. 2022) (en banc)

............................................................................................................... 30, 34

*Sears v. Warden GDCP*, 73 F.4th 1269 (11th Cir. 2023) ................................. 30, 31

*Smith v. Comm'r, Ala. Dep't of Corr.*, 924 F.3d 1330 (11th Cir. 2019) .................28

*United States v. Charles*, 722 F.3d 1319 (11th Cir. 2013) ................................ 34, 36

*United States v. Ignasiak*, 667 F.3d 1217 (11th Cir. 2012) ................. 36, 37, 40, 41

*Wilson v. Sellers*, 138 S. Ct. 1188 (2018) ................................................................30

## **STATUTES**

28 U.S.C. § 1291 ......................................................................................................8

28 U.S.C. § 2241 ......................................................................................................8

28 U.S.C. § 2253 ......................................................................................................8

28 U.S.C. § 2254 ........................................................................... 8, 10, 28, 29, 35

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

This is an appeal from the December 14, 2022 final order of the United States District Court for the Southern District of Florida denying Petitioner-Appellant Reginald Bertram Johnson's *pro se* 28 U.S.C. § 2254 petition.  D.58.  The district court had jurisdiction under 28 U.S.C. § 2241(a) and (d).  Johnson timely filed his notice of appeal on January 17, 2023.  D.59.  This Court has jurisdiction under 28 U.S.C. §§ 1291 and 2253(a).

## STATEMENT OF THE ISSUES

Whether the district court erred by denying Johnson's claim that the state trial court violated his confrontation rights by admitting into evidence a forensic analysis report, containing testimonial hearsay, when its author was not called to testify at trial and, thus, could not be cross examined.

## STATEMENT OF THE CASE

### I.  Proceedings and Disposition Below

In 2008, Johnson was arrested after DNA from his saliva was matched to the DNA from semen collected from a fourteen-year-old rape victim eight years before. D.15-1 at 7, 122–30; D.16-3 at 4–9, 15–16; D.35-1 at 148.[1]  The state charged him

---

[1] Pinpoint citations to documents filed on the district court docket are to the ECF-generated page numbers at the top of documents.

with two counts of armed sexual battery, two counts of armed lewd and lascivious molestation of a child between the ages of twelve and sixteen, one count of armed robbery, one count of armed kidnapping, and one count of possession of a firearm by a convicted felon. D.15-1 at 122–30. The state trial court dismissed the counts for armed robbery and possession of a firearm by a convicted felon count because they were barred by the statute of limitations. *Id.* at 132–35.

Following a three-day trial held in September 2011, the jury found Johnson guilty of two counts of sexual battery with a deadly weapon and one count each of kidnapping without a firearm and of lewd and lascivious molestation of a child between the ages of twelve and sixteen. D.15-2 at 36–37; D.16-6 at 93–94. The state trial court sentenced Johnson to two consecutive life sentences on the sexual battery and kidnapping charges, and to a consecutive thirty-year sentence on the lewd and lascivious molestation charge. D.15-2 at 39–45.

Florida's Third District Court of Appeal affirmed the sexual battery and kidnapping convictions but reversed the conviction for lewd and lascivious molestation because it arose from the same act as the sexual battery convictions and therefore violated double jeopardy. *Johnson v. State*, 117 So. 3d 1238, 1245 (Fla. Dist. Ct. App. 2013). The Florida Supreme Court denied Johnson's petition for discretionary review. *Johnson v. State*, 147 So. 3d 524 (Fla. 2014). The United States Supreme Court denied Johnson's petition for writ of certiorari. *Johnson v.*

*Florida*, 574 U.S. 896 (2014).

Johnson filed a Florida Rule of Criminal Procedure 3.850 motion for postconviction relief. D.15-3 at 2–33. The state trial court denied Johnson's Rule 3.850 motion. *Id.* at 35–39. The Third District Court of Appeal summarily affirmed the denial, except for one ineffective assistance of counsel claim which was reversed and remanded for further proceedings. *Johnson v. State*, 203 So. 3d 916, 918 (Fla. Dist. Ct. App. 2016). On remand, the state trial court denied Johnson's remaining claim. D.15-3 at 73–75. The Third District Court of Appeal *per curiam* affirmed. *Johnson v. State*, 252 So. 3d 221 (Fla. Dist. Ct. App. 2018).

On August 20, 2019, Johnson timely filed a 28 U.S.C. § 2254 petition in the United States District Court for the Southern District of Florida. D.1. The district court referred Johnson's § 2254 petition to the magistrate judge for a report and recommendation. D.31 The magistrate judge recommended that Johnson's § 2254 petition be denied and that a certificate of appealability be denied. D.52 at 26. The district court affirmed and adopted the magistrate judge's report and recommendation, denied Johnson's § 2254 petition, and denied a certificate of appealability. D.58 at 1.

Johnson timely appealed the district court's order. D.59. This Court granted Johnson a certificate of appealability on one issue:

Whether the district court erred by denying Johnson's Claim . . . that the trial court violated his confrontation rights by admitting into evidence a forensic analysis report, containing testimonial hearsay, when its author was not called to testify at trial and, thus, could not be cross-examined.

App.D.15-1 at 5.

## II.    Statement of Relevant Facts

### A. The Crime, Police Investigation & Arrest

On December 19, 2000, a man abducted fourteen-year-old C.A. from a Miami sidewalk, drove her a vacant lot, forced her to engage in oral and vaginal sex, and stole her money.  D.16-5 at 17–32.  That night, Detective Steven Signori, who conducted the ensuing investigation, met C.A. at the rape treatment center at Jackson Memorial Hospital.  D.16-3 at 48.  Police took C.A. to the rape treatment center because doctors at the rape treatment center examined victims of sexual assault, collected evidence, and wrote reports for police.  *Id.*

Dr. Scott Silla examined C.A. at the rape treatment center.  *Id.* at 56; *see* D.16-4 at 82–83.  He performed a forensic gynecological examination of C.A. and collected biologic specimens from her.  D.16-3 at 57; D.16-5 at 39.  Nurse Valerie Carter assisted Dr. Silla during his examination of C.A. by giving him the tools he needed, but did not examine C.A.  D.16-4 at 53–54, 62, 69.  Only Dr. Silla, Nurse Carter, and C.A. were present in the examination room.  *Id.* at 54.

After his examination of C.A., and outside of Nurse Carter's presence, Dr.

Silla wrote a report of his examination.  App.D.24 at 8–9;[2] D.16-4 at 63–64, 72–73. In his report, Dr. Silla wrote that the "Police Dept." was "MDPD" and that the "Officer" was "Det. Signori," and wrote C.A.'s "Case #."  App.D.24 at 8.  Under the heading "History of Assault," Dr. Silla indicated "Yes" in his report next to "Threats," "Restraints," and "Weapon."  *Id.*  He also wrote under the "History of Assault" part of the report statements that C.A. allegedly made to him, including that the assailant had a "gun/knife," that the assailant held a "knife at [her] neck," and that the assailant told her "Don't move or I'll shoot you."  *Id.*  And, Dr. Silla wrote, presumably based on statements C.A. allegedly made to him, that C.A.'s assailant had penetrated C.A. both orally and vaginally with his penis.  *Id.*

In the "Comments" section of his report, Dr. Silla wrote that C.A. told him that her assailant "forced [her] in a car + took [her] to a lot" where "he pulled [her] pants down," "penetrated [her] (pointing to genital area)," "made [her] put his penis in [her] mouth," and that "he was grabbing [her] breast."  *Id.*

Under the heading "General Exam," Dr. Silla drew a diagram of C.A.'s vagina and indicated where on C.A.'s vagina he observed "fresh tears."  *Id.*  Under the heading "Pelvic Exam," Dr. Silla wrote that he observed "fresh tears" and "scant blood" during his forensic gynecological examination of C.A. and that C.A.'s

---

[2] This Court granted Johnson's unopposed motion to supplement the record with a complete, two-page copy of Dr. Silla's report, which is attached as Exhibit A to the motion.  *See* App.D.25.

"adnexae" was difficult to access because of the pain caused by the tears in C.A.'s vagina. *Id.*; *see* D.16-4 at 90.

Dr. Silla also documented in his report that he collected biologic specimens from C.A. and that he gave the specimens to Detective Signori. App.D.24 at 9; *see* D.16-4 at 31–32, 90–91. Under the heading "Evidential Specimens, Testing and Receipt," Dr. Silla indicated that he had obtained a total of nineteen specimens from C.A., including one blood sample, six vaginal swabs, and six cervical swabs, and that each of these specimens were "Given to Police." App.D.24 at 9. Dr. Silla, Nurse Carter, and Detective Signori signed Dr. Silla's report. *Id.*; *see* D.16-4 at 57–58, 91–92.

After Dr. Silla completed his report, he handed Detective Signori a copy of it and "a brown paper bag that contained a specimen that he obtained during the examination." D.16-3 at 57, 64–65. Detective Signori impounded the bag containing the specimens Dr. Silla collected at the Miami-Dade Police Department serology lab. *Id.* at 57, 64–66. At the serology lab, forensic analyst Sharon Hinz tested the specimens and determined that the swabs collected from C.A.'s vagina were positive for the presence of semen and that the DNA "profile" of the semen was from someone other than C.A. *Id.* at 176–77, 182–83; D.16-4 at 6–7. Ms. Hinz never examined C.A., nor was she present when any of the statements Dr. Silla wrote in his report were made to him by C.A. D.16-4 at 27–29.

From the rape treatment center, Detective Signori drove C.A. and her mother to the place where C.A. had been abducted and to the vacant lot where she had been assaulted.  D.16-3 at 66–67.  The next morning, Detective Signori returned to both locations but was unable to find any witnesses or collect anything of evidentiary value.  *Id.* at 70–71, 76, 112–24, 142.  Detective Signori also arranged for C.A. to assist a forensic sketch artist with preparing a composite sketch of her assailant.  *Id.* at 75–78.  Detective Signori used the composite sketch to prepare and send a "be on the lookout" to police departments in Miami, but he never received any leads.  *Id.* at 77–79, 129, 132.

The case went cold for eight years.  *Id.* at 79–80.  Then, in 2008, Detective Signori got a lead:  an "initial DNA hit" from a DNA sample police collected from Johnson in a separate criminal case matched the DNA found in the semen that Dr. Silla had collected from C.A.  *Id.* at 80; D.35-1 at 148.  Detective Signori met C.A. and showed her a photograph of Johnson and told her Johnson was a suspect.  D.16-3 at 81–83, 132–34.  But when Detective Signori asked C.A. if she knew the man in the photograph, C.A. said "I don't know him."  *Id.* at 81–83, 132–34.

Detective Signori brought Johnson in for an interview.  *Id.* at 84.  Johnson denied knowing C.A. when Detective Signori showed him C.A.'s driver's license photograph.  *Id.* at 86–87.  When Detective Signori falsely told Johnson that C.A. was "accusing [him] of abducting and raping her," Johnson denied it.  *Id.* at 86–88.

And when Detective Signori told Johnson that the police had "DNA evidence" against him, Johnson maintained that he did not recognize C.A. but said he "might have dated her once" because he had "dated a lot of people." *Id.* at 135–36.

After the interview, police took oral swabs from Johnson and sent them to the Miami-Dade Police Department serology lab for analysis. D.16-4 at 11–13; D.35-1 at 149–50. Ms. Hinz compared the DNA from Johnson's oral swabs to the DNA from the semen Dr. Silla had collected from C.A.'s vagina. D.16-4 at 13–15, 22–24. Ms. Hinz determined that the DNA from Johnson's oral swabs matched the DNA found in the semen that Dr. Silla had collected from C.A.'s vagina. *Id.* at 20–24.

The police then arrested Johnson and charged him with two counts of armed robbery, one count of armed kidnapping, two counts of armed lewd and lascivious molestation of a child between the ages of twelve and sixteen, and one count of possession of a firearm by a convicted felon. D.15-1 at 7, 122–30. The counts for armed robbery and possession of a firearm were dismissed on statute of limitations grounds, and the case proceeded to trial on the remaining charges. *Id.* at 132–35.

## B. The Trial

Johnson's trial took place in September 2011. D.16-1 at 2; D.16-6 at 2. From the start, the state made clear to the jury that its case against Johnson hinged on Dr. Silla's report of his examination of C.A. and the specimens he collected from her at

the rape treatment center. *See* D.16-3 at 32, 35–36. Yet, the state chose not to call Dr. Silla. Instead, Dr. Silla's report was admitted based on other witnesses' testimony.

### 1. **The prosecutor's opening statement**

During his opening statement, the prosecutor told the jury that C.A. "went to the rape treatment center and was fully examined," was asked "what took place, what happened," was "poked and prodded, and her body was fully examined," and that "evidence that is really important in this case is the swabs that were taken from [C.A.'s] vagina" because they "matched" Johnson's DNA—a "one in twenty-nine billion match." D.16-3 at 31–32, 35–36. The prosecutor explained to the jury how, before the DNA "match," Detective Signori's investigation "went nowhere for many, many years" because Detective Signori was "unable to find anything." *Id.* at 33.

The state called five witnesses: (1) Detective Signori, (2) Ms. Hinz, (3) Nurse Carter, (4) Dr. Karen Simmons, who was the rape treatment center's medical director when Dr. Silla examined C.A., and (5) C.A. *Id.* at 43, 163; D.16-4 at 52, 80; D.16-5 at 14.

### 2. **Detective Signori**

Detective Signori testified that Dr. Silla examined C.A. at the rape treatment center. D.16-3 at 48, 56. Detective Signori acknowledged that he was not present

for the examination of C.A., but instead was later provided a "copy of the report" written by Dr. Silla along with "a brown paper bag that contained a specimen that [Dr. Silla] obtained during the examination." *Id.* at 51, 57.

Based on this testimony, the state attempted to introduce into evidence the brown paper bag containing the biologic specimens Dr. Silla collected from C.A. *Id.* at 59. Defense counsel objected because Detective Signori could not "testify to the relevance of this item other than the doctor walked out from the examination room and gave him something" and could not "testify as to where it came from." *Id.* at 61–62. The state trial court asked the prosecutor how the state intended to show that Dr. Silla "g[ot] it from the victim," to which the prosecutor responded that he "ha[d] a witness . . . Nurse Carter [who] was present with Dr. Silla, who created the report." *Id.* at 63. The state trial court told the prosecutor that he was "going to have to call him[3] back for this." *Id.*

After additional testimony from Detective Signori regarding the brown paper bag's chain of custody after Dr. Silla handed the brown paper bag to Detective Signori, the state again sought to introduce the specimens into evidence. *Id.* at 93–96. The state trial court admitted the specimens into evidence over defense counsel's objection, "subject to being linked up with other witnesses." *Id.* at 96.

---

[3] It is unclear if the state trial court was referring to Dr. Silla or Detective Signori.

On cross examination, Detective Signori confirmed that he had determined that C.A. "suffered no injuries in the case" and testified that he "d[idn't] believe [C.A.] was injured." *Id.* at 128–29. Detective Signori also testified that, even though he told C.A. he was bringing her "a picture of a suspect," C.A. told him that she "d[idn't] know him" when Detective Signori showed her Johnson's picture. *Id.* at 132–34.

On re-direct examination, Detective Signori confirmed that "the most important piece" of his investigation was "having the victim go immediately to the rape treatment center" to "have her examined." *Id.* at 143. Detective Signori also confirmed that he did not physically examine C.A. to determine whether she had been injured. *Id.* Rather, Detective Signori testified, "[i]t would be" Dr. Silla who determined that C.A. had injuries. *Id.* at 144.

### 3.    <u>Sharon Hinz</u>

The state's next witness was Ms. Hinz. Before Ms. Hinz took the stand, defense counsel objected to her anticipated testimony that she matched the DNA from the swabs taken from Johnson to the DNA from the semen that Dr. Silla had collected from C.A. D.16-3 at 161–62. Defense counsel explained that Ms. Hinz's testimony was "premature" because the state hadn't yet "linked the swabs . . . into evidence," and Nurse Carter wasn't going to be able to do so because she "ha[d] no independent recollection" of Dr. Silla's examination of C.A. *Id.* at 162. The state

trial court decided to "see what happens when she testifies" and instructed defense counsel that he could "renew [his] objections after her testimony." *Id.* at 162–63.

Ms. Hinz testified that, in January 2001, she tested the vaginal swabs that Dr. Silla collected from C.A. and determined that they were positive for the presence of semen and identified DNA in the semen. *Id.* at 179–83; D.16-4 at 7. Ms. Hinz testified that she also tested the oral swabs taken from Johnson in 2008, compared Johnson's DNA to the DNA from the semen Dr. Silla collected from C.A., and concluded that Johnson's DNA matched the DNA from the semen Dr. Silla collected from C.A. D.16-4 at 11–20. Ms. Hinz explained that that the chances of Johnson's DNA matching the DNA from the semen Dr. Silla collected from C.A. was "one in twenty-nine-point-eight billion." *Id.* at 23–24.

On cross examination, Ms. Hinz confirmed that she was not present when the semen from the vaginal swabs she compared to Johnson's DNA was collected from C.A. at the rape treatment center, or for any other part of the examination of C.A. *Id.* at 27–28.

### 4.    **Nurse Carter**

The state called Nurse Carter as its third witness. D.16-4 at 52. Before Nurse Carter took the stand, defense counsel informed the state trial court that the state "intend[ed] to call Dr. Simmons" who "was not present for any of the examination" of C.A. and was "relying upon a report produced by another doctor, a Dr. Silla, . . .

and she would testify regarding what is on that report, and [defense counsel] believe[d] it is a violation of *Crawford*, and [his] client's right to cross-examine witnesses against him, and also, [defense counsel] believe[d] it conflicts with *Bullcoming v[.] New Mexico*." *Id.* at 49–50. The state trial court told defense counsel to "object whenever you think it is appropriate." *Id.* at 51.

Nurse Carter testified that she worked at the rape treatment center in December 2000 and that her job was to "[b]e a witness and just basically give [the doctors] the swabs, and tools that they need to do the rape case." *Id.* at 53–54. In other words, Nurse Carter explained, "the doctors did the exam," while Nurse Carter "just helped assist them, giving them the tools that they needed. That's it." *Id.* at 53–54. Nurse Carter explained that she "d[idn't] do the examination" and therefore "wouldn't necessarily know if anything is going on or if anything is wrong in th[e] vaginal area." *Id.* at 69. Nurse Carter testified that she had no independent recollection of C.A. or her case, and the only basis for her conclusion that she was there was her signature on Dr. Silla's report. *Id.* at 57–58, 62, 71–72, 75–76. Nurse Carter also testified that she recognized Dr. Silla's handwriting on the report of the examination of C.A. and that she'd seen hundreds of reports of examinations at the rape treatment center, but that Dr. Silla prepared the report outside of her presence and she "really d[idn't] have much to do with the paperwork or what the doctors write on the paper." *Id.* at 64, 72–73.

Based on Nurse Carter's testimony, the state sought to introduce into evidence Dr. Silla's report of his examination of C.A. under the business records exception to the rule against hearsay, arguing that Nurse Carter qualified as a records custodian. *Id.* at 64–65. Defense counsel objected on the grounds that the state had not laid a sufficient foundation and "the violations of *Crawford*" arising from Johnson's inability "to cross-examine the contents of this form, which was prepared by the doctor." *Id.* at 65–67. Defense counsel explained that Dr. Silla's report was "a testimonial document," that the state "ha[d] not shown that [Dr. Silla was] unavailable," and Johnson had not had a prior opportunity to cross-examine Dr. Silla. *Id.* at 68. The state trial court admitted Dr. Silla's report of his examination of C.A. over defense counsel's objection. *Id.*

On cross-examination, Nurse Carter testified that "Dr. Silla would have written [the report]," that she "ha[d] nothing to do with the information he wrote," and that she "wouldn't know what he wrote." *Id.* at 75.

Based on Nurse Carter's testimony on cross-examination, defense counsel renewed his objection to the admission of Dr. Silla's report because Nurse Carter "ha[d] no idea other than saying where it goes, who took it," and "ha[d] no responsibility for that form." *Id.* at 76. The state trial court again overruled the objection. *Id.* at 77.

### 5.    Dr. Simmons

With Dr. Silla's report admitted into evidence over defense counsel's objections during Nurse Carter's testimony, the state called Dr. Simmons to testify about the contents of Dr. Silla's report.  *See* D.16-4 at 85–92.  Dr. Simmons, however, was not present during the examination of C.A. and had no input in the drafting of Dr. Silla's report.  *Id.* at 95–96.

Dr. Simmons explained that the evidence that an examining doctor would collect during an examination of a sexual assault victim "would depend on each case, and depend[] on what sites the sexual assault happened."  *Id.* at 85.  Dr. Simmons testified that Dr. Silla collected vaginal swabs as part of his examination of C.A. and that the swabs the state had introduced into evidence were "the way [they] w[ere] originally."  *Id.* at 85–87.

The prosecutor also handed Dr. Silla's report to Dr. Simmons and asked her questions about its contents.  *Id.* at 88–89.  Defense counsel objected because Dr. Simmons was "interpreting a report that was not prepared by her."  *Id.* at 89.  But the state trial court overruled defense counsel's objection.  *Id.*

First, the prosecutor asked Dr. Simmons if, "based upon [her] review of the report," C.A. "receive[d] any injuries in this case?"  *Id.*  Dr. Simmons answered, "Yes, she did.  She had fresh tears to the entrance of the vagina, that skin between the vagina and rectum."  *Id.*

Second, the prosecutor asked Dr. Simmons what the term "fresh tears" meant in Dr. Silla's report. *Id.* Dr. Simmons answered that "[f]resh tears is evidence of blunt penetrating trauma." *Id.*

Third, the prosecutor asked Dr. Simmons, "what would that [blunt penetrating trauma] result from?" *Id.* at 90. Dr. Simmons responded that "it would depend," but explained that "[w]ith this history, since she says penile/vaginal, it would be consistent with that." *Id.*

Fourth, the prosecutor asked Dr. Simmons why Dr. Silla used the word "fresh" rather than the word "old" to describe the tears he observed in C.A.'s vagina. *Id.* Dr. Simmons testified that "fresh" meant that "it is an injury that is still recent" because "[y]ou see bleeding" and "the cut or the laceration." *Id.*

Fifth, the prosecutor asked Dr. Simmons to describe Dr. Silla's "examination regarding the adnexae." *Id.* Dr. Simmons testified based on Dr. Silla's report that "[i]t was difficult to assess secondary to . . . the tear. It hurt. It was uncomfortable. [He] had difficulty assessing that." *Id.*

Sixth, the prosecutor asked what Dr. Silla meant when he indicated "given to the police" in the report. *Id.* at 91. Dr. Simmons testified that it meant that Dr. Silla gave the specimens he collected from C.A. to the police. *Id.*

On cross-examination, Dr. Simmons confirmed that she was not present for Dr. Silla's examination of C.A. and never spoke to C.A. *Id.* at 95–96.

### 6.    <u>C.A.</u>

C.A., the state's final witness, testified that she remembered a doctor taking specimens from her at the rape treatment center.  D.16-5 at 39, 46.  C.A. testified that that she couldn't describe the injuries she suffered, but explained that her vaginal area "hurt[]" and that when she put "tissue there, [there] would be little bloodstains." *Id.* at 40.

On cross-examination, C.A. testified that she was not sure whether the doctor took "one or two" swabs from her and that she did not remember whether the doctor took any blood from her.  *Id.* at 51–52.

Based on C.A.'s testimony, defense counsel again objected to the admission into evidence of the specimens collected by Dr. Silla from C.A.  *Id.* at 64–65. Defense counsel explained that "[n]o one witnessed these items being taken from the alleged victim," C.A. had testified that she did "not recall the blood being taken" and only remembered one or two swabs being taken, and that "[n]obody has identified these items as being from the alleged victim."  *Id.* at 65.  The state trial court overruled defense counsel's objection, finding "that the State has sufficiently established a chain of custody."  *Id.* at 66.

### 7.    <u>The prosecutor's closing argument</u>

In his closing argument, the prosecutor emphasized the importance of Dr. Silla's report to the state's case against Johnson.  "[T]he DNA," the prosecutor said, was "the one thing" that Detective Signori needed to get during his initial

investigation and was a "huge" piece of evidence because the DNA in the semen Dr. Silla collected from C.A.'s vagina belonged to Johnson—a "one in twenty-nine-billion" chance. D.16-6 at 11, 15. The prosecutor told the jury that "there [was] no question about the DNA; none, whatsoever" and that "[i]t was found in the victim's vaginal area" and "obtained at the rape treatment center." *Id.* at 14–15. According to the prosecutor, it wasn't necessary for C.A. to identify Johnson because "we had [Johnson's] semen inside the most intimate part that [C.A.] has on her body." *Id.* at 56–57. The prosecutor explained to the jury that "we know it was [Johnson] because of the DNA" and that "what points to Reginald Johnson and what caught him eight years later [was the] DNA." *Id.* at 56.

The prosecutor also walked the jury through Dr. Silla's report and asked the jury "to look at it with a fine tooth comb." *Id.* at 17. The prosecutor emphasized that Dr. Silla's statements in the report about what C.A. told him and about the injuries that Dr. Silla observed were made "within hours of the victim being attacked and abducted" and specifically pointed the jury to the "personal history" and "pelvic exam" sections of Dr. Silla's report. *Id.* Dr. Silla's statement in his report that C.A. had "fresh tears" was, the prosecutor said, "one of the most important things here." *Id.* The prosecutor also told the jury that Dr. Silla's statement in his report that C.A. had "scant blood" meant that Dr. Silla "did observe blood" in C.A.'s vaginal area. *Id.* at 18. The prosecutor emphasized that what Dr. Silla wrote that he observed

when he examined C.A.'s vagina was "consistent" with C.A.'s testimony about what happened to her.  *Id.* at 18–19.

The prosecutor concluded his closing argument by once again bringing the jury's attention to Dr. Silla's report, telling the jury that the DNA was "the best piece of evidence possible," that "the weight that DNA carries is all that really matters," that the DNA was "the most important piece of evidence [the prosecutor] had," that "DNA does not lie," that the chances of a DNA match were "one in twenty-nine billion," and that "we have tears in her vaginal area, consistent with blunt force, consistent with not being consensual."  *Id.* at 55–59, 62–63.

### 8.    The jury's verdict and Johnson's life sentences

The jury convicted Johnson of two counts of sexual battery with a deadly weapon and one count each of kidnapping without a firearm and of lewd and lascivious molestation of a child between the ages of twelve and sixteen.  D.15-2 at 36–37; D.16-6 at 93–94.  The state trial court sentenced Johnson to two consecutive life sentences for the sexual battery and kidnapping charges, and to a consecutive thirty-year sentence for the lewd and lascivious molestation charge.  D.15-2 at 39–45.

### C. Direct Appeal

Johnson appealed his convictions, arguing in relevant part that the admission of Dr. Silla's report and the DNA evidence without providing Johnson with an

opportunity to cross-examine Dr. Silla at trial violated his Sixth Amendment right to confront his accuser. *Johnson*, 117 So. 3d at 1242. The Third District Court of Appeal held that, although "the report is testimonial in nature," the "introduction of the DNA evidence and Dr. Silla's report did not deprive [Johnson] of his confrontation rights." *Id.* at 1242, 1243. Johnson's confrontation rights were not violated, the Third District Court of Appeal reasoned, because he had the opportunity to cross-examine (1) "the person who actually performed the DNA test, Sharon Hinz"; and (2) "Nurse Carter, who was present and assisted Dr. Silla in his examination and his collection of the evidence, [and] also signed the report documenting the events." *Id.* at 1245.

The Florida Supreme Court denied Johnson's petition for discretionary review. *Johnson v. State*, 147 So. 3d 524 (Fla. 2014). The United States Supreme Court denied Johnson's petition for writ of certiorari. *Johnson v. Florida*, 574 U.S. 896 (2014).

### D. Federal Habeas Proceedings

After exhausting his state remedies,[4] Johnson filed a § 2254 petition for writ of habeas corpus in the Southern District of Florida. D.1. In his amended § 2254 petition, Johnson claimed that the state trial court violated his confrontation rights

---

[4] In the district court, Respondents-Appellees conceded that Johnson "has exhausted the State's remedies" and that his "claims are not procedurally defaulted." D.22 at 18.

by admitting Dr. Silla's report into evidence. D.7 at 8. The district court referred Johnson's § 2254 petition to the magistrate judge for a report and recommendation. D.31. The magistrate judge recommended that Johnson's claim be denied, concluding that (1) the Florida Supreme Court did not err in determining that admission of Dr. Silla's report did not violate Johnson's confrontation rights "because [Ms.] Hinz's testimony that she examined and tested the evidence, matching the DNA profile from the samples taken from C.A. to [Johnson]'s DNA profile, was subjected to extensive cross examination by the defense regarding her testing and findings"; and (2) Johnson's trial was not "rendered fundamentally unfair resulting from the state's failure to call Dr. Silla to testify at trial regarding the securing of the specimens and its chain of custody." D.52 at 17. The district court adopted the magistrate judge's recommendation. D.58 at 1.

## III.    Standards of Review

The district court's denial of a 28 U.S.C. § 2254 petition is reviewed de novo. *Smith v. Comm'r, Ala. Dep't of Corr.*, 924 F.3d 1330, 1336 (11th Cir. 2019). Two standards apply when a federal habeas petitioner, as here, contests a state court's determination of his claim of constitutional error:    (1) the Antiterrorism and Effective Death Penalty Act ("AEDPA"), and (2) the "actual prejudice" test under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Both standards must be met for a

federal habeas court to grant a § 2254 petition.  *See Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1307–08 (11th Cir. 2012).

### A. Antiterrorism and Effective Death Penalty Act

When a state court has adjudicated a habeas petitioner's claim on the merits, the state court's decision is reviewed under AEDPA's "highly deferential standards."  *Davis v. Ayala*, 576 U.S. 257, 269 (2015).  Under those highly deferential standards, a federal court may not grant a § 2254 petition unless the state court's adjudication was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

The focus under § 2254(d) is on the "last reasoned" state court decision.  *See McGahee v. Ala. Dep't of Corr.*, 560 F.3d 1252, 1261 n.12 (11th Cir. 2009) (quotation omitted).  When the final state court decision on the merits doesn't come with reasons—as here, where the Florida Supreme Court summarily denied Johnson's petition for discretionary review—a federal habeas court "'look[s] through' the unexplained decision to the last related state-court decision that does provide a relevant rationale"—here, the Third District Court of Appeal's decision affirming Johnson's convictions on direct appeal—and "then presume[s] that the

unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

In assessing whether the state court's decision was reasonable, a "federal habeas court reviews only the state court's decision and is not limited to the particular justifications that the state court supplied." *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1037–38 (11th Cir. 2022) (en banc). That means the federal habeas court looks to "the *reasons* for the state court's decision" and then "consider[s] any potential *justifications* for those reasons." *Id.* at 1036. The federal habeas court defers to the state court's determination so long as it was not "so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Id.* (quotation omitted).

## B. The *Brecht* Standard

To grant habeas relief based on constitutional trial error, the federal habeas court must find not only that error occurred, but that it resulted in "actual prejudice." *Brecht*, 507 U.S. at 637 (quotation omitted); *see Sears v. Warden GDCP*, 73 F.4th 1269, 1280 (11th Cir. 2023) ("If a petitioner satisfies § 2254(d)'s requirements, we then consider whether the state court's error was harmless."); *see also Trepal v. Sec'y, Fla. Dep't of Corr.*, 684 F.3d 1088, 1111 n.26 (11th Cir. 2012) ("We do not phrase the *Brecht* requirement as a burden of proof, for it is not."). "Under this test, relief is proper only if the federal court has grave doubts about whether a trial error

of federal law had substantial and injurious effect or influence in determining the jury's verdict." *Davis*, 576 U.S. at 267–68. "There must be more than a 'reasonable possibility' that the error was harmful." *Id.* (quoting *Brecht*, 507 U.S. at 637). Harmlessness under the *Brecht* standard is a question of law that is reviewed de novo, *Mansfield*, 679 F.3d at 1307, and the constitutional error is considered "in relation to all else that happened at trial," *Trepal*, 684 F.3d at 1114 (quotation omitted).

Whether a Confrontation Clause error was harmless "may depend on, among other things, 'the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Al-Amin v. Warden Ga. Dep't of Corr.*, 932 F.3d 1291, 1302 (11th Cir. 2019) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). "[W]hen a court is in virtual equipoise as to the harmlessness of the error under the *Brecht* standard, the court should treat the error as if it affected the verdict." *Fry v. Pliler*, 551 U.S. 112, 121 n.3 (2007); *see Sears*, 73 F.4th at 1300 ("Even if the record left us only at 'virtual equipoise' on the question of prejudice, Supreme Court precedent tells us to treat the [constitutional] error as harmful.").

## SUMMARY OF THE ARGUMENT

The Florida Supreme Court unreasonably applied *Crawford v. Washington*, 541 U.S. 36 (2004), *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), and *Bullcoming v. New Mexico*, 564 U.S. 647 (2011) in determining that the state trial court did not violate Johnson's confrontation rights by admitting Dr. Silla's report, and testimony about it, without Johnson having the opportunity to cross-examine Dr. Silla.

The Sixth Amendment's Confrontation Clause allows admission of absent witnesses' testimonial statements "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford*, 564 U.S. at 59, 68. "A document created solely for an 'evidentiary purpose,' . . . made in aid of a police investigation, ranks as testimonial." *Bullcoming*, 564 U.S. at 664 (quoting *Melendez-Diaz*, 557 U.S. at 311).

No fairminded jurist could disagree that Dr. Silla's report—prepared for the sole purpose of aiding Detective Signori's investigation of C.A.'s case—was "testimonial" evidence. *See Bullcoming*, 564 U.S. at 664; *Melendez-Diaz*, 557 U.S. at 311; *Crawford*, 541 U.S. at 52. The examination that led to the report was done pursuant to the direction of the police, and the report generated after that examination (along with evidentiary specimens collected) were immediately given to the police. But the state neither called Dr. Silla to testify nor asserted that he was unavailable.

Nor did Johnson have an opportunity to cross-examine Dr. Silla. Accordingly, the Florida Supreme Court unreasonably applied *Crawford*, *Melendez-Diaz*, and *Bullcoming* in determining that the state trial court's admission of Dr. Silla's report did not violate Johnson's confrontation rights.

The admission of Dr. Silla's report, and testimony from others about it, in violation of Johnson's confrontation rights resulted in actual prejudice. The state's case hinged on the match between Johnson's DNA and the DNA from the specimens collected from C.A.'s vagina, but Dr. Silla's report was the only evidence connecting the specimens that were matched to Johnson's DNA to C.A.'s vagina. The state therefore relied heavily on Dr. Silla's report in its opening statement and closing argument and called Dr. Simmons for the sole purpose of parroting and explaining the hearsay contents of Dr. Silla's report to the jury. Moreover, the state used Dr. Silla's report as powerful contemporaneous evidence to corroborate C.A.'s trial testimony about what had happened to her and the injuries she suffered. Because Johnson was deprived of the opportunity to cross-examine Dr. Silla about the accuracy of his recollection and interpretation of what C.A. told him, his determinations about the injuries C.A. suffered, the reliability of the methods he used to collect specimens from C.A., and the veracity of his statement that he collected specimens from C.A.'s vagina and gave those specimens to the police, he was unable to rebut the prosecutor's repeated assertions that there was "no question" about the

DNA evidence which was the foundation of the state's otherwise weak case against Johnson.

## ARGUMENT AND CITATIONS OF AUTHORITY

I.    **The Florida Supreme Court Unreasonably Applied *Crawford*, *Melendez-Diaz*, and *Bullcoming* In Determining That The Admission of Dr. Silla's Report Did Not Violate Johnson's Confrontation Rights**

The Florida Supreme Court determined that the admission of Dr. Silla's report did not violate Johnson's confrontation rights because Johnson had an opportunity to cross-examine Ms. Hinz and Nurse Carter. *Johnson*, 117 So. 3d at 1245. This is a clear misapplication of *Crawford*, *Melendez-Diaz*, and *Bullcoming* that "lies beyond any possibility for fairminded disagreement." *See Pye*, 50 F.4th at 1036.

At the time of Johnson's trial in September 2011, it was clearly established federal law that "[a] document created solely for an 'evidentiary purpose,' . . . made in aid of a police investigation, ranks as testimonial." *Bullcoming*, 564 U.S. at 664 (quoting *Melendez-Diaz*, 557 U.S. at 311). It was also clearly established federal law that the Sixth Amendment prohibits the introduction of out-of-court testimonial statements unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 68; *see United States v. Charles*, 722 F.3d 1319, 1328–29 (11th Cir. 2013) ("In addition to *Crawford*, the Supreme Court has emphatically reiterated, in *Melendez-Diaz* and *Bullcoming*, that where the admission of an absent declarant's testimonial statements

is at issue, the Confrontation Clause permits their admission only if the declarant is legitimately unavailable to testify *and* only if the defendant has had a prior opportunity to cross-examine the declarant.").

The Florida Supreme Court, at least implicitly, correctly applied *Crawford*, *Melendez-Diaz*, and *Bullcoming* in determining that Dr. Silla's report is testimonial. *See Johnson*, 117 So. 3d at 1243 ("[T]he report is testimonial in nature . . . .").[5] Dr. Silla's purpose in examining C.A. and drafting his report was to collect evidence and assist Detective Signori's investigation of C.A.'s case.  D.16-3 at 48; D. 16-4 at 90– 92; *see* App.D.24 at 8–9.  Dr. Silla's report bears indicia of its evidentiary purpose,

---

[5] In the portion of its decision analyzing whether Dr. Silla's report was properly authenticated and admissible as a business record, the Third District Court of Appeal wrote that "any testimonial aspect of Dr. Silla's report only related to the collection of the specimen from the victim" and that "[t]he report makes no statement, conclusion, or accusation about or against the defendant." *Johnson*, 117 So. 3d at 1243.  This factual finding is incorrect, as shown by "clear and convincing evidence."  *See* 28 U.S.C. § 2254(e); *Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1145 (11th Cir. 2022) (explaining that the petitioner "has the added burden under § 2254(e)(1) of rebutting by 'clear and convincing evidence' the presumption of correctness given to state court factual findings, both express and implied").  Specifically, Dr. Silla's report states that C.A.'s assailant caused C.A. to have "fresh tears" and "scant blood" in her vagina, used "Threats," "Restraints" and a "Weapon," had a "gun/knife," held a "knife at [her] neck," told C.A. "Don't move or I'll shoot you," penetrated C.A. both orally and vaginally with his penis, "forced [her] in a car + took [her] to a lot" where "he pulled [her] pants down," "penetrated [her] (pointing to genital area)," "made [her] put his penis in [her] mouth," and that "he was grabbing [her] breast."  App.D.24 at 8.  Each of these statements are, and were used at trial as, statements, conclusions, and accusations about and against Johnson.  *See Garlick v. Lee*, 1 F.4th 122, 134 (2d Cir. 2021) (statements in autopsy report describing the victim's wounds and the manner and cause of death "were out-of-court substitutes for trial testimony").

including Dr. Silla's signature, the police's case number, Detective Signori's name and signature, "MDPD," and indications about whether the "Evidential Specimens" Dr. Silla collected were "Given to Police." App.D.24 at 8–9; *see* D.16-4 at 31–32, 57–58, 90–92. Moreover, Dr. Silla handed a copy of his report to Detective Signori immediately after he completed it. D.16-3 at 57, 64–65. "In sum, the formalities attending [Dr. Silla's] report are more than adequate to qualify [Dr. Silla's] assertions as testimonial," *see Bullcoming*, 564 U.S. at 665, and the statements in Dr. Silla's report about his examination of C.A. are "the precise testimony [Dr. Silla] would be expected to provide if called at trial," *see Melendez-Diaz*, 557 U.S. at 311; *see also United States v. Ignasiak*, 667 F.3d 1217, 1230 (11th Cir. 2012) ("Forensic reports constitute testimonial evidence."); *Garlick*, 1 F.4th at 133–35 (concluding autopsy report created in aid of an active police investigation was testimonial and inadmissible without confrontation).

The Florida Supreme Court, however, applied *Crawford*, *Melendez-Diaz*, and *Bullcoming* unreasonably in determining that the admission of Dr. Silla's report did not violate Johnson's confrontation rights. Because Dr. Silla's report was testimonial, clearly established federal law prohibited its admission unless Dr. Silla was unavailable to testify and Johnson had a prior opportunity to cross-examine him. *See Crawford*, 541 U.S. at 68; *Charles*, 722 F.3d at 1328–29. Neither requirement was met. The state made no showing that Dr. Silla was unavailable and Johnson had

no prior opportunity to cross-examine Dr. Silla. Thus, no fairminded jurist could agree with the Florida Supreme Court that the admission of Dr. Silla's report did not violate Johnson's confrontation rights.

The Florida Supreme Court's conclusion that Johnson's opportunity to cross-examine Ms. Hinz and Nurse Carter rendered the admission of Dr. Silla's report constitutional is also an unreasonable application of clearly established federal law. The Supreme Court "specifically rejected the use of so-called 'surrogate testimony' . . . in *Bullcoming*." *See Ignasiak*, 667 F.3d at 1230. Specifically, the Supreme Court held that the Confrontation Clause "does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination." *Bullcoming*, 564 U.S. at 662; *see Ignasiak*, 667 F.3d at 1230 ("[I]n *Bullcoming* . . . the Court made clear that the Sixth Amendment requires that, when introducing testimonial forensic evidence, the prosecution must present testimony by a scientist who was actually involved in preparing that forensic evidence."). Thus, "the analysts who write reports that the prosecution introduced must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa.'" *Bullcoming*, 564 U.S. at 661 (quoting *Melendez-Diaz*, 557 U.S. at 319–20, n.6).

Under the Supreme Court's holding in *Bullcoming*, neither Ms. Hinz nor

Nurse Carter were constitutionally adequate substitutes for Dr. Silla. For one, Ms. Hinz had nothing to do with Dr. Silla's examination of C.A. or the drafting of Dr. Silla's report. *See* D.16-4 at 27–28. She didn't even work at the rape treatment center. D.16-3 at 163. No reasonable jurist could conclude that Ms. Hinz's surrogate testimony satisfied the Confrontation Clause's requirements.

And Nurse Carter, although physically present for Dr. Silla's examination of C.A., did not remember C.A. or her case, and testified that her only role was to "just help assist [the doctor], giving [the doctor] the tools that they needed. That's it." D.16-4 at 53–54, 71–72. And even if Nurse Carter had remembered Dr. Silla's examination of C.A., Dr. Silla's examination of C.A. was based on his skill, methodology, and judgment as a medical doctor. *See* App.D.24 at 8–9; D.16-4 at 85. Nurse Carter, on the other hand, "d[idn't] do the examination" and "wouldn't necessarily know if anything is going on or if anything is wrong in th[e] vaginal area." D.16-4 at 69. Nor was Nurse Carter equipped to testify as to the veracity of Dr. Silla's statements in his report about the specimens he collected from C.A. and about whether he gave those specimens to the police. Indeed, Nurse Carter "ha[d] nothing to do with the information [Dr. Silla] wrote" in his report and "wouldn't know what he wrote." D.16-4 at 64, 75.

Accordingly, "surrogate testimony of the kind [Ms. Hinz and Nurse Carter] w[ere] equipped to give could not convey what [Dr. Silla] knew or observed about

the events his [report] concerned," *i.e.*, his examination of C.A., the specimens he collected from C.A., what C.A. told him during the examination, and whether the specimens he gave Detective Signori were the same specimens he collected from C.A. *See Bullcoming*, 564 U.S. at 661–62. "Nor could such surrogate testimony expose any lapses or lies on [Dr. Silla's] part." *See id.*

The testimonial content of Dr. Silla's report was dependent on at least four things which the Confrontation Clause "command[ed] . . . be assessed . . . by testing in the crucible of cross-examination," *see Crawford*, 541 U.S. at 61: (1) the accuracy of Dr. Silla's recollection and interpretation of what C.A. told him about what had happened to her; (2) his determinations about the injuries C.A. suffered; (3) the reliability of the methods he used to collect specimens from C.A.; and (4) whether he had, as stated in his report, collected specimens from C.A.'s vagina and given those specimens to the police. *See* App.D.24 at 8–9; D.16-4 at 90–92. The first and fourth of these things—the accuracy and veracity of Dr. Silla's statements about what C.A. told him and his statement that he collected specimens from C.A.'s vagina and gave them to the police—are testimony that "must" have "be[en] introduced live" because "there is little reason to believe that confrontation will be useless in testing [Dr. Silla's] honesty." *See Melendez-Diaz*, 557 U.S. at 311 n.1, 321. And the second and third of these things were not only testimonial but also particularly "dependent upon the skill, methodology, and judgment" Dr. Silla exercised as a

medical doctor, *see Ignasiak*, 667 F.3d at 1233, which "present[ed] a risk of error that might be explored on cross-examination," *see id.* (quoting *Melendez-Diaz*, 557 U.S. at 320).   As Detective Signori testified, "[i]t would be" Dr. Silla who determined that C.A. had injuries, D.16-3 at 144, and as Dr. Simmons explained, Dr. Silla would have exercised his professional medical judgment in determining the sites from which he would collect evidence from a sexual assault victim like C.A., *see* D.16-4 at 85.   The Florida Supreme Court unreasonably applied clearly established federal law in concluding that Ms. Hinz's and Nurse Carter's testimony was a constitutionally adequate surrogate for Dr. Silla's.

Under *Crawford*, *Melendez-Diaz*, and *Bullcoming*, Dr. Silla's report is testimonial and was erroneously admitted without an opportunity for cross-examination.   No fairminded jurist could agree with the Florida Supreme Court's contrary determination.

## II.    The Violation of Johnson's Confrontation Rights Was Not Harmless

The unreasonably erroneous admission of Dr. Silla's report at Johnson's trial resulted in actual prejudice.   Each of the *Van Arsdall* factors demonstrate that the erroneous admission of Dr. Silla's report had a substantial and injurious effect or influence in determining the jury's verdict.

*First*, Dr. Silla's report was critically important to the state's case against Johnson.   *See Al-Amin*, 932 F.3d at 1302.   A violation of a habeas petitioner's

confrontation rights is harmful "when the State procures its key witness by violating the petitioner's rights." *Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1356 (11th Cir. 2011). Dr. Silla—through the testimonial statements he wrote in his report— was undoubtedly the state's most important witness. Because C.A. did not identify Johnson as her assailant, the state's case hinged on the match between the DNA in the semen Dr. Silla collected from C.A.'s vagina and Johnson's DNA. And Dr. Silla's report was the only evidence that the semen Ms. Hinz matched to Johnson's DNA came from C.A.'s vaginal area. *See* D.16-4 at 91. For this reason, the prosecutor emphasized the importance of Dr. Silla's report in both his opening statement and closing argument, asking the jury "to look at it with a fine tooth comb" and telling the jury over and over and over again that the "evidence that is really important in this case is the swabs that were taken from [C.A.'s] vagina" because they "matched" Johnson's DNA—a "once in twenty-nine billion match." *E.g.*, D.16-3 at 15, 32, 35–36; D.16-6 at 56–57. And the state called Dr. Simmons to parrot the hearsay contents of Dr. Silla's report and give Dr. Silla's report her imprimatur. "To paraphrase the Supreme Court's reasoning in *Melendez-Diaz*, 'there is little reason to believe that confrontation [would have] be[en] useless in testing [Dr. Silla's] honesty, proficiency, and methodology—the features that are commonly the focus in the cross-examination of experts.'" *See Ignasiak*, 667 F.3d at 1233 (quoting *Melendez-Diaz*, 557 U.S. at 321). Accordingly, Johnson was

actually prejudiced by the state trial court's violation of his right to confront Dr. Silla. *See Guzman*, 663 F.3d at 1356.

*Second*, Dr. Silla's report was not merely cumulative. *See Al-Amin*, 932 F.3d at 1302. No other witness could testify that the semen which Ms. Hinz matched to Johnson's DNA was collected from C.A.'s vaginal area. Moreover, because Dr. Silla's report was the only contemporaneous evidence of what C.A. said had happened to her and what C.A.'s injuries were, and because Dr. Silla's report was the only medical evidence of C.A.'s injuries, Dr. Silla's report was powerful corroborating evidence of C.A.'s trial testimony. As the prosecutor emphasized in his closing argument, Dr. Silla's statements in his report about what C.A. had told him and about the injuries that Dr. Silla observed were made "within hours of the victim being attacked and abducted," and Dr. Silla's statement about observing "fresh tears" in C.A.'s vaginal area was "one of the most important things" because it was "consistent with blunt force, consistent with not being consensual." D.16-6 at 17–18, 63.

*Third*, there was an absence of corroborating evidence and evidence in contradiction. *See Al-Amin*, 932 F.3d at 1302. Because Nurse Carter did not remember Dr. Silla's examination of C.A., D.16-4 at 62, 71–72, and because no other witness saw Dr. Silla place the specimens in the brown paper bag that he handed to Detective Signori, no one but Dr. Silla could corroborate that the semen

that Ms. Hinz matched to Johnson's DNA came from C.A.'s vaginal area. There was also evidence contradicting Dr. Silla's report. Dr. Silla wrote in his report that he collected twelve swabs from C.A.'s vaginal area and that he took blood from her, *see* App.D.24 at 9, but C.A. testified that she did not remember Dr. Silla taking more than "one or two" swabs from her and did not remember whether Dr. Silla took any blood from her, D.16-5 at 51–52. Moreover, Dr. Silla wrote in his report that C.A. suffered "fresh tears" in her vagina, App.D.24 at 8, but Detective Signori testified that he had determined that C.A. "suffered no injuries in the case" and testified that he "d[idn't] believe [C.A.] was injured." D.16-3 at 128–29.

*Fourth*, the "extent of cross-examination otherwise permitted" was zero because Dr. Silla did not testify at trial. *See Al-Amin*, 932 F.3d at 1302.

*Fifth*, without Dr. Silla's report, the state's case against Johnson was flimsy. *See id.* "Errors are harmful . . . when there are 'significant weaknesses' in the State's case against the defendant." *Guzman*, 663 F.3d at 1355. Without the statements in Dr. Silla's report that the specimens in the brown bag he handed to Detective Signori came from C.A.'s vagina, the state had no evidence linking Johnson's DNA to the crime. And without the DNA evidence, the state didn't have a case against Johnson. As the prosecutor accurately previewed for the jury in his opening statement, Detective Signori's investigation "went nowhere for many, many years" because Detective Signori was "unable to find anything." D.16-3 at 33; *see* D.16-3 at 70–

71, 76, 112–24, 142.  The composite sketch which C.A. assisted police prepare didn't result in any leads.  D.16-3 at 77–79, 129, 132.  Johnson never confessed.  D.16-3 at 135–36.  And even after Detective Signori showed C.A. a picture of Johnson and told her that Johnson was a suspect, C.A. never identified Johnson as her assailant.  D.16-3 at 132–34.

The Second Circuit's analysis of the *Van Arsdall* factors in *Garlick* is instructive.  In that case, the court concluded that a state trial court's erroneous admission of an autopsy report and testimony about it had a substantial and injurious effect or influence in determining the jury's verdict.  *Garlick*, 1 F.4th at 128, 136.  The court reasoned that the autopsy report's admission was not harmless because: (1) the state introduced the autopsy report as a trial exhibit and "heavily relied on it in its opening and closing statements"; (2) the state "used the autopsy report to eliminate [a different individual] as a potential cause of the victim's death"; (3) "[n]o other medical evidence was offered at trial to establish the cause and manner of the victim's death"; (4) the state "also offered the autopsy report as evidence of [the petitioner's] intent to cause serious physical injury"; (5) the autopsy report contradicted the petitioner's denial that he had a knife; (6) "[t]he autopsy report was the strongest evidence in the [s]tate's case and was not cumulative of other inculpatory evidence connecting [the petitioner] to the victim's death"; and (7) the surrogate witness who testified about the autopsy report's contents "did not conduct

or even participate in the autopsy, could not testify with respect to the procedures and methods that were followed in reaching its conclusions or to the qualifications of the examiner" and therefore "[e]ven rigorous cross-examination of [the surrogate witness] could not have adequately revealed any defects in the autopsy's methods, conclusions, and reliability. *Id.* at 136.

This case is like *Garlick*. As in *Garlick*, (1) the prosecutor in Johnson's case "heavily relied" on Dr. Silla's report in his opening statement and closing argument, *e.g.*, D.16-3 at 15, 32, 35–36; D.16-6 at 56–57; (2) the state used Dr. Silla's report to eliminate any other person but Johnson as C.A.'s assailant, *e.g.*, D.16-4 at 23–24; (3) Dr. Silla's report was the only medical evidence offered at trial to establish C.A.'s injuries, (4) Dr. Silla's report was offered as evidence that C.A.'s injuries were "consistent with blunt force, consistent with not being consensual," D.16-6 at 55–59, 62–63, (5) Dr. Silla's report was "the strongest evidence in the [s]tate's case and was not cumulative of other inculpatory evidence connecting [Johnson] to" the crime, and (6) even vigorous cross-examination of Ms. Hinz and Nurse Carter "could not have adequately revealed any defects in [Dr. Silla's] methods, conclusions, and reliability." *See Garlick*, 1 F.4th at 136. The erroneous admission of Dr. Silla's report at Johnson's trial was at least as harmful as the erroneous admission of the autopsy report in *Garlick*.

This case is nothing like cases in which this Court has determined that a

violation of a habeas petitioner's confrontation rights didn't cause actual prejudice. In *Mason v. Allen*, 605 F.3d 1114 (11th Cir. 2010), for example, this Court concluded that the Confrontation Clause error did not cause actual prejudice because the defendant "confessed to the murder shortly after being arrested" and "described in detail the murder scene found by the officers" and "the murder weapon was found in his car." 605 F.3d at 1124. And in *Grossman v. McDonough*, 466 F.3d 1325 (11th Cir. 2006), this Court concluded that the Confrontation Clause error did not cause actual prejudice where "[t]he evidence against [the defendant]—both physical and testimonial—was overwhelming," including fingerprint evidence, inculpatory testimony, and the murder victim's charred shoes which the defendant had tried to destroy. 466 F.3d at 1340. Unlike the "overwhelming" evidence against the defendants in *Mason* and *Grossman*, here the state had little evidence against Johnson (which the prosecutor all but admitted in his opening statement and closing argument to the jury) other than the DNA evidence from the vaginal swabs Dr. Silla's report said had been collected from C.A. and given to police.

## CONCLUSION

The Florida Supreme Court unreasonably applied *Crawford*, *Melendez-Diaz*, and *Bullcoming* in determining that the admission of Dr. Silla's report did not violate Johnson's confrontation rights, and the state trial court's Confrontation Clause error caused Johnson actual prejudice. Johnson therefore respectfully requests that this

Court grant his petition.

This 15th day of February, 2024

Respectfully Submitted,

By: /s/ *Robert G. Keefe*
Robert G. Keefe
**BOIES SCHILLER FLEXNER LLP**
100 S.E. 2nd Street – Suite 2800
Miami, FL 33131
Tel:     (305) 539-8400
Fax:     (305) 539-1307
rkeefe@bsfllp.com
*Attorney for Petitioner-Appellant,*
*Reginald Bertram Johnson*

**<u>CERTIFICATE OF COMPLIANCE</u>**

This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(i) because this document contains 10,602 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2021 in a 14-point Times New Roman font.

/s/ *Robert G. Keefe*
Robert G. Keefe

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on February 15, 2024, a true and correct copy of the foregoing was filed with the Clerk of Court via the Court's CM/ECF system for electronic service on all counsel of record.

/s/ *Robert G. Keefe*
Robert G. Keefe
